**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | |
|---|---|
| O'BRYAN COMPOSTING, LLC, | No. 4:24-cv-0100-DJH-HBB |
| Plaintiff, | |
| v. | |
| JULIE SU, IN HER OFFICIAL CAPACITY AS ACTING SECRETARY OF THE UNITED STATES DEPARTMENT OF LABOR, et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

BACKGROUND..................................................................................................................2

I.      Statutory and Regulatory Framework.........................................................................2

II.     Procedural History....................................................................................................6

LEGAL STANDARDS.......................................................................................................7

ARGUMENT......................................................................................................................8

I.      Plaintiff cannot establish any likelihood of success on the merits.............................8

     A.    Congress constitutionally regulated agricultural work by foreign nationals and authorized the Secretary of Labor to adjudicate violations.......................................8

     B.    Receiving federal permission to hire and import foreign nationals to work within the United States is a matter of public rights. ...............................................10

     C.    Plaintiff's APA claim is duplicative of its Seventh Amendment and Due Process claims, and Plaintiff likewise lacks any likelihood of success on the merits on that claim. ...............................................................................................................19

II.     Plaintiff cannot establish irreparable harm.............................................................20

III.    The balance of the equities do not favor entering an injunction here.......................22

CONCLUSION..................................................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Dole,*
   923 F.2d 182 (D.C. Cir. 1991) ..................................................................................14

*Arizona v. United States,*
   567 U.S. 387 (2012) ............................................................................................ 9, 10

*Atlas Roofing Co. v. Occupational Safety and Health Rev. Comm'n,*
   430 U.S. 442 (1977) ......................................................................................... 12, 17

*Axon Enter. Inc. v. F.T.C.,*
   598 U.S. 175 (2023) ..................................................................................................20

*Bonnell v. Lorenzo,*
   241 F.3d 800 (6th Cir. 2001) ...................................................................................21

*Borden, Inc. v. FTC,*
   495 F.2d 785 (7th Cir. 1974) ...................................................................................21

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ....................................................................................................9

*Collins v. Yellen,*
   594 U.S. 220 (2021) ..................................................................................................20

*Crowell v. Benson,*
   285 U.S. 22 (1932) .................................................................................9, 10, 16, 19

*Dep't of State v. Muñoz,*
   144 S. Ct. 1812 (2024) ..............................................................................................18

*Elgebaly v. Garland,*
   109 F.4th 426 (6th Cir. 2024) .............................................................9, 10, 12, 15

*FTC v. Standard Oil Co. of Cal.,*
   449 U.S. 232 (1980) ..................................................................................................21

*Hispanic Affairs Project v. Acosta,*
   901 F.3d 378 (D.C. Cir. 2018) ...................................................................................2

*La. Forestry Ass'n Inc. v. U.S. Dep't of Labor,*
   745 F.3d 653 (3d Cir. 2014) ............................................................................... 2, 12

*Leachco, Inc. v. Consumer Prod. Safety Comm'n,*
   103 F.4th 748 (10th Cir. 2024), *petition for cert. filed*, No. 24-156 (U.S. Aug. 13, 2024)............... 20, 21

*Lloyd Sabaudo Societa Anonima Per Azioni v. Elting,*
    287 U.S. 329 (1932) ........................................................................................................ 5, 11, 21

*Martin Marietta Energy Sys., Inc. v. Martin,*
    909 F. Supp. 528 (E.D. Tenn. 1993) ........................................................................................21

*Maryland v. King,*
    567 U.S. 1301 (2012) ........................................................................................................22

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ........................................................................................................16

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ........................................................................................................8

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ........................................................................................4

*Meta Platforms, Inc. v. FTC,*
    No. CV 23-3562 (RDM), 2024 WL 1121424 (D.D.C. Mar. 15, 2024), *appeal docketed,* 24-5054 (D.C. Cir. Mar. 15, 2024), *den. inj. pending appeal,* No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024) ........................................................................................................20

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................................ 8, 22

*NLRB v. Jones & Laughlin Steel Corp.,*
    301 U.S. 1 (1937) ........................................................................................................17

*Noriega-Perez v. United States,*
    179 F.3d 1166 (9th Cir. 1999) ........................................................................................ 13, 16

*Oceanic Steam Navigation Co. v. Stranahan,*
    214 U.S. 320 (1909) ........................................................................................8, 11, 12, 15

*Oil States Energy Services, LLC v. Greene's Energy Grp., LLC,*
    584 U.S. 325 (2018) ........................................................................................................ 9, 10

*Overdevest Nurseries, L.P. v. Walsh,*
    2 F.4th 977 (D.C. Cir. 2021) ........................................................................................................1

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't,*
    305 F.3d 566 (6th Cir. 2002) ........................................................................................................21

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982 ) ........................................................................................................10

*Priorities USA v. Nessel,*
    860 F. App'x 419 (6th Cir. 2021) ........................................................................................................22

*Remileh v. INS*,
   101 F.3d 66 (8th Cir. 1996) ........................................................................................18

*Ruiz v. Fernandez*,
   No. CV-11-3088-RMP, 2012 WL 1442556 (E.D. Wash. Apr. 26, 2012) ........................4

*Sampson v. Murray*,
   415 U.S. 61 (1974) ........................................................................................21

*Sarnova HC, LLC v. Reetz*,
   No. 2:21-CV-0601, 2021 WL 1257081 (S.D. Ohio Apr. 5, 2021) ........................21

*SEC v. Jarkesy*,
   144 S. Ct. 2117 (2024) ........................................................................................*passim*

*Stern v. Marshall*,
   564 U.S. 462 (2011) ........................................................................................9

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985) ........................................................................................17

*Thompson v. DeWine*,
   976 F.3d 610 (6th Cir. 2020) ........................................................................................8

*Trump v. United States*,
   603 U.S. 593 (2024) ........................................................................................12

*United States ex rel. Turner v. Williams*,
   194 U.S. 279 (1904) ........................................................................................12

*Velasquez-Tabir v. INS*,
   127 F.3d 456 (5th Cir. 1997) ........................................................................................18

*Villegas-Valenzuela v. INS*,
   103 F.3d 805 (9th Cir. 1996) ........................................................................................18

*Willy v. Admin. Rev. Bd.*,
   423 F.3d 483 (5th Cir. 2005) ........................................................................................5, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................7

*YAPP USA Auto. Sys., Inc. v. NLRB*,
   No. 24-12173, 2024 WL 4119058 (E.D. Mich. Sept. 9, 2024), *appeal docket*ed, No. 24-1754 (6th Cir. Sept. 9, 2024), *den. stay pending appea*l, No 24-1754, 2024 WL 4489598 (6th Cir. Oct. 13, 2024), *den. app*l., No. 24A348, 2024 WL 4508993 (U.S. Oct. 15, 2024) ........................................................................................20, 21

*YAPP USA Auto. Sys., Inc. v. NLRB*,
   No 24-1754, 2024 WL 4489598 (6th Cir. Oct. 13, 2024) ........................................................................................20, 21

*York Risk Servs. Grp., Inc. v. Couture,*
    787 F. App'x 301, 309 (6th Cir. 2019) ..........................................................21

**Statutes**

5 U.S.C. § 704 ...............................................................................................5

5 U.S.C. § 706(2)(B) .....................................................................................19

8 U.S.C. § 1101(a)(15) ................................................................................2, 3

8 U.S.C. § 1182(n)(2)(C) ..............................................................................18

8 U.S.C. § 1183 .............................................................................................19

8 U.S.C. § 1183a(d) ......................................................................................19

8 U.S.C. § 1184(c)(14)(A)(i) ........................................................................18

8 U.S.C. § 1188 .......................................................................................*passim*

8 U.S.C. § 1288(c)(4)(E) ...............................................................................19

8 U.S.C. § 1324a ......................................................................................13, 18

8 U.S.C. § 1324c ............................................................................................16

8 U.S.C. § 1375a(d)(1) ..................................................................................19

Act of July 31, 1789, ch. 5, 1 Stat. 29 ...........................................................9

Immigration Reform and Control Act of 1986,
    Pub. L. No. 99-603, 100 Stat. 3359 ...................................................2, 4, 19

**Legislative Materials**

H.R. Rep. No. 99-682(I) (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649 ...........1, 13

**Administrative & Executive Materials**

8 C.F.R. § 214.2(h)(5) ...............................................................................5, 14

20 C.F.R. § 655.100 .......................................................................................3

20 C.F.R. § 655.122 ................................................................................*passim*

20 C.F.R. § 655.135 ...............................................................................3, 13, 14

29 C.F.R. § 18.10(a) ..................................................................................4, 16

29 C.F.R. §§ 18.50-65 ........................................................................................................ 4, 16

29 C.F.R. § 18.70(c) ........................................................................................................... 4, 16

29 C.F.R. § 18.72 ................................................................................................................. 5, 16

29 C.F.R. § 18.81-82 ........................................................................................................... 5, 16

29 C.F.R. § 18.92 ................................................................................................................. 5, 16

29 C.F.R. §§ 501.15-501.47 .....................................................................................................19

29 C.F.R. § 501.16 ...................................................................................................................... 4

29 C.F.R. § 501.19 ...................................................................................................................... 4

29 C.F.R. § 501.31 ...................................................................................................................... 4

29 C.F.R. § 501.32 ...................................................................................................................... 4

29 C.F.R. § 501.33(a) .......................................................................................................... 5, 21

29 C.F.R. §§ 501.33-35 .............................................................................................................. 4

29 C.F.R. § 501.41 .......................................................................................................... 4, 5, 16

29 C.F.R. § 501.42 .............................................................................................................. 5, 21

*Changes to Requirements Affecting H-2A Nonimmigrants,*
    73 Fed. Reg. 76,891 (Dec. 18, 2008) ..................................................................................13

*Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of*
    *the Immigration and Nationality Act,*
    52 Fed. Reg. 16,795 (May 5, 1987) ....................................................................................19

*Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of*
    *the Immigration and Nationality Act,*
    52 Fed. Reg. 20,524, (June 1, 1987) .................................................................................3, 4

*Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B*
    *Nonimmigrant Worker Programs,*
    83 Fed. Reg. 2,646 (Jan. 18, 2018) .....................................................................................14

*Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B*
    *Nonimmigrant Worker Programs,*
    86 Fed. Reg. 2,689 (Jan. 13, 2021) .....................................................................................14

*Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B*
    *Nonimmigrant Worker Programs,*
    86 Fed. Reg. 62,559, 62,561 (Nov. 10, 2021) .............................................................14-15, 15

*Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*,
  88 Fed. Reg. 77,343 (Nov. 9, 2023) ..........................................................................................5

*Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement*,
  73 Fed. Reg. 77,110 (Dec. 18, 2008) ..........................................................................................2

*Temporary Agricultural Employment of H-2A Aliens in the United States*,
  74 Fed. Reg. 45,906, 45,918 (Sept. 4, 2009) ............................................................................14

*Temporary Agricultural Employment of H-2A Aliens in the United States*,
  75 Fed. Reg. 6,884, 6,921 (Feb. 12, 2010) ................................................................................13

*Secretary's Order 01-2020—Delegation of Authority and Assignment of Responsibility to the Administrative Review Board*,
  85 Fed. Reg. 13,186 (Mar. 6, 2020) ..................................................................................... 5, 21

## **Other Authorities**

Andorra Bruno, Congressional Research Service, H-2A and H-2B Temporary Worker Visas: Policy and Related Issues (2023) ..........................................................................................................5

Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*,
  65 CASE W. RESERVE L. REV. 1083 (2015) ................................................................................9

Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*,
  65 CASE W. RESERVE L. REV. 1083 (2015) ................................................................................9

Statement On Signing the Immigration Reform and Control Act of 1986,
  2 Pub. Papers 1522 (Nov. 6, 1986) ...........................................................................................18

## INTRODUCTION

Under Congress's foreign-commerce and immigration-related powers, "[t]he United States has long provided temporary work authorization for foreign agricultural workers." *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2021). To that end, the "H–2 program, in one form or another, has been an element of U.S. immigration policy since the 1940's." H.R. Rep. No. 99-682(I), at 50 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5654. And since 1986, Congress has tasked the Secretary of Labor with regulating the H-2A program and "tak[ing] such actions, including imposing appropriate penalties" as "may be necessary to assure" compliance with the program. 8 U.S.C. § 1188(g)(2). Now, despite the fact that the H-2A program in its current form has been in place for nearly 40 years, Plaintiff O'Bryan Composting contends that the Department of Labor's enforcement regime—which uses administrative law judges ("ALJs") to adjudicate H-2A violations—contravenes the Seventh, Fifth, and Fourteenth Amendments of the Constitution and the Administrative Procedure Act.

Plaintiff asserts that the Supreme Court's recent decision in *SEC v. Jarkesy*, 144 S. Ct. 2117, 2132 (2024), compels this Court to conclude that Plaintiff is entitled to a jury trial in an Article III court, and thus the administrative enforcement proceedings at issue here violate the Seventh Amendment. But *Jarkesy* reiterated what an unbroken line of Supreme Court precedent has made clear: Congress' "plenary power over immigration" implicates matters of public rights that can be constitutionally adjudicated within the Executive Branch. *Id.* And enforcing the Immigration and Nationality Act, and its associated regulations, is a quintessential area of "public rights" that cannot be analogized to proceedings traditionally recognized at common law. Because Plaintiff's claims fail on the merits, Plaintiff likewise cannot establish any irreparable harm, or that the balance of the equities favors Plaintiff here. Accordingly, this Court should deny Plaintiff's motion for a preliminary injunction.

## BACKGROUND

### I.    Statutory and Regulatory Framework

In the Immigration and Nationality Act, Congress "established the modern framework for regulation of immigration in the United States, including provisions for the admission of permanent and temporary foreign workers." *La. Forestry Ass'n Inc. v. U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014). As part of the Act, Congress created the H-2 visa program which permits U.S. employers to recruit and hire foreign workers for temporary agricultural and non-agricultural jobs. *Id.* Congress then amended the program as part of the Immigration Reform and Control Act of 1986 ("IRCA"), to establish separate requirements for agricultural and nonagricultural foreign workers. Pub. L. No. 99-603, title III, part A, § 301, 100 Stat. 3359, 3411. In Title III of that Act, concerning the "Reform of Legal Immigration," Congress provided a "new 'H-2A' nonimmigrant classification for temporary agricultural labor." 100 Stat. at 3411 (capitalization altered). The new H-2A visa regime allowed for the controlled "admission of temporary H-2A workers," and created a framework whereby prospective employers would "petition to import an alien" subject to certain conditions and approval by the Executive Branch. *Id.* (capitalization altered).

Workers eligible for an H-2A visa must have "no intention of abandoning" their permanent residence in a foreign country. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Thus, H-2A workers "have no independent route to apply for permanent residency or legal citizenship," but instead are "dependent on their [employer] visa sponsors to lawfully stay in and return to the United States for work." *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 382 (D.C. Cir. 2018). Because of that continuing intention to return to their country of origin, H-2A workers are defined to be "nonimmigrant aliens." 8 U.S.C. § 1101(a)(15). Although "[f]oreign agricultural labor has contributed to the growth and success of America's agricultural sector since the 19th century," *Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement*, 73 Fed. Reg. 77,110, 77,111 (Dec. 18, 2008), Congress did not want H-2A workers to displace the domestic labor force. Thus, Congress tasked the Department of Labor with certifying, as a condition for the potential admission of H-2A workers, that "there are not sufficient workers who are able, willing, and qualified" to perform

the agricultural work and that employing H-2A workers "will not adversely affect the wages and working conditions of" similarly employed workers in the U.S. 8 U.S.C. § 1188(a)(1).

Under the H-2A program, qualifying employers may hire foreign workers "to perform agricultural labor or services" of "a temporary or seasonal nature" in the United States. *Id.* § 1101(a)(15)(H)(ii)(a). To do so, the employer must first seek certification from the Department of Labor that (1) "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed" to fill the open position, and (2) hiring foreign workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." *Id.* § 1188(a)(1); 20 C.F.R. § 655.100. After a certification issues, Congress directed that the employer must hire qualified U.S. workers who apply for the job during the first half of the "period of the [seasonal] work contract." 8 U.S.C. § 1188(c)(3)(B)(i); *accord* 20 C.F.R. § 655.135(d). And Congress required the sponsoring employer to "provide benefits, wages and working conditions required pursuant to this section and regulations," and to comply with other certification requirements. 8 U.S.C. § 1188(c)(3)(A)-(B). Thus, an employer's job offer must give workers in the U.S. "no less than the same benefits, wages, and working conditions" that will be available to H-2A workers, 20 C.F.R. § 655.122(a), and the regulations set forth various requirements to protect similarly employed workers from adverse effects to their "wages and working conditions." *Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of the Immigration and Nationality Act*, 52 Fed. Reg. 20,524, 20,524 (June 1, 1987).

Employers voluntarily choose to participate in the H-2A program because it confers benefits not afforded to other employers in the United States: the ability to hire foreign workers to fulfill temporary labor needs. To obtain these benefits, however, an employer must agree to abide by the terms of the program, including those established by the Labor Department's H-2A regulations. *See* 20 C.F.R. § 655.135. Even "after an employer's H-2A application is approved and the employer hires foreign laborers," the employer "must continue to provide its American and foreign workers the minimum wages and working conditions laid out in the regulations to ensure the employment of foreign workers does not adversely affect the terms of employment of similarly employed American

workers." *Mendoza v. Perez*, 754 F.3d 1002, 1008 (D.C. Cir. 2014) (citing 20 C.F.R. § 655.122(a)); 8 U.S.C. § 1188(a)(1)(B). Those regulations require, among other things, providing suitable housing that meets regulatory requirements, providing safe transportation to and from the worksite, and compliance with certain recordkeeping requirements. *See generally* 20 C.F.R. § 655.122.

The Secretary of Labor is responsible for enforcing the requirements of the H-2A program. *Ruiz v. Fernandez*, No. CV-11-3088-RMP, 2012 WL 1442556, at *3 (E.D. Wash. Apr. 26, 2012). In passing the Immigration Reform and Control Act of 1986 ("IRCA"), Congress authorized the Secretary of Labor "to take such actions, including imposing appropriate penalties" as "may be necessary to assure employer compliance with terms and conditions of employment under this section." Pub. L. No. 99-603, tit. III, § 301, 100 Stat. 3359, 3416 (codified at 8 U.S.C. § 1188(g)(2)). An employer's use of the H-2A program is only permissible under the immigration laws if the Secretary of Labor has issued the required certification as to sufficiency of workers and prevention of adverse effect. And such certification is only meaningful if the conditions underlying it can be enforced by the Department of Labor. To that end, within months of the IRCA's enactment, the Secretary promulgated regulations authorizing administrative proceedings to recover back wages, enforce program obligations, and assess civil money penalties for violations of the Act or its implementing regulations. 52 Fed. Reg. at 20,524, 20,527 & 20,531 (promulgating 29 C.F.R. § 501.16). Through these administrative proceedings, the Administrator may impose civil monetary penalties which may be assessed for each violation" of the statute or regulations. 29 C.F.R. § 501.19(a), (b). That includes potential monetary penalties "for each violation committed against each worker." 52 Fed. Reg. at 20,531 (promulgating 29 C.F.R. § 501.19).

If the Department of Labor determines that an employer violated the Act or its implementing regulations, it notifies the employer of its findings as well as the remedies sought. 29 C.F.R. §§ 501.31, 501.32. The employer can request a hearing before an ALJ, *id.* §§ 501.33-35, who will preside over an adversarial hearing and issue a decision, *id.* § 501.41. Department of Labor regulations specify that "[t]he Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for," *id.* § 18.10(a). The parties can move to dismiss, *id.* § 18.70(c), take discovery, *id.* §§ 18.50–65, and move for the

equivalent of summary judgment, *id.* § 18.72(a). There may also be the equivalent of a bench trial where the parties present evidence and testimony to the ALJ, after which the ALJ "must issue a written decision and order." *Id.* §§ 18.92; 18.81–82; 501.41. The ALJ's decision can be appealed to the Administrative Review Board, *id.* § 501.42, a multimember board of adjudicators appointed by the Secretary of Labor, *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 491 (5th Cir. 2005). The Secretary may also personally review the Board's decision. *Secretary's Order 01-2020—Delegation of Authority and Assignment of Responsibility to the Administrative Review Board*, 85 Fed. Reg. 13,186, 13,188 (Mar. 6, 2020). The Secretary's imposition of penalties may be subject to judicial review to determine whether it is authorized by statute, supported by substantial evidence, and consistent with due process. *See, e.g.*, 29 C.F.R. §§ 501.42(a), 501.33(a) (both referencing "judicial review"); *see also Lloyd Sabaudo Societa Anonima Per Azioni v. Elting,* 287 U.S. 329, 335-36 (1932) (recognizing that actions of the Secretary in imposing civil penalties may be subject to judicial review); 5 U.S.C. § 704.

More than 298,000 visas were issued to temporary workers under the H-2A program in fiscal year 2022. Andorra Bruno, Congressional Research Service, H-2A and H-2B Temporary Worker Visas: Policy and Related Issues app. at 29 (2023). Because of the important role that the H-2A program plays in immigration, the H-2A program is carefully monitored by the Secretary of Homeland Security and the Secretary of State, who determine which countries are eligible to participate in the program. *See Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 88 Fed. Reg. 77,343, 77,343-44 (Nov. 9, 2023). In making these determinations, the Secretaries consider how a foreign country cooperates with the United States when its nationals are subject to removal, how many removal orders concern that country's nationals, and "other factors as may serve the U.S. interest." 8 C.F.R. § 214.2(h)(5)(i)(F)(1). Consistent with those immigration and foreign policy concerns, H-2A visas may not be issued to foreign workers from Cuba, Iran, and Russia, but may be issued to workers (for example) from Chile, Italy, and New Zealand, among other countries. *See* 88 Fed. Reg. at 77345-46.

## II.     Procedural History

Plaintiff alleges that it is engaged in swine operations, and, for many years, has employed foreign workers through the H-2A agricultural visa program, which enables agricultural employers to supplement their workforce on a seasonal basis when there is a demonstrated lack of available U.S. labor. *See* Compl. ¶ 10, ECF No. 1. On October 22, 2022, the Department of Labor, Administrator of the Wage and Hour Division, issued to Plaintiff a Notice of Determination of Assessing Civil Monetary Penalties. Pl.'s Ex. A to the Compl., ECF No. 1-1 at 2. As explained in the Notice, an investigation conducted by the Wage and Hour Division disclosed that Plaintiff failed to comply with Section 218 of the Immigration and Nationality Act and applicable regulations. *Id.* As uncovered in the investigation, the Wage and Hour Division documented violations for failure to provide and maintain a safe workplace and living environment, including by: failing to provide required housing to certain workers; failing to provide transportation free of charge to certain workers; providing some housing that offered no protection from the elements and that lacked a functioning front screen door, trash can, fire alarm, and had broken windows; providing beds less than one foot above the floor, having workers sleep on the floor, taking away workers' mattresses after one month and requiring them to pay for mattresses; providing cars that lacked functioning seatbelts for transportation to the worksite; and failing to keep accurate and adequate records, among other things. 20 C.F.R. § 655.122(q),(d)(1), (d)(2), (d)(3); (h)(2), (h)(3), (h)(4), (p), (j)(1), (k); ECF No. 1-1 at 6-10. The Wage and Hour Division determined that 117 workers were owed back wages in the amount of $339,504.09 and assessed civil monetary penalties in the amount of $445,081.00. ECF No. 1-1 at 1.

On November 22, 2022, Plaintiff timely responded to the Administrator's Determination Notice by requesting a hearing, Pl.'s Ex. B to the Compl., ECF No. 1-2 at 14, and the matter was referred to an ALJ for a hearing. *Id.* at 1. On July 23, 2024, Plaintiff filed a demand for a jury trial, arguing that "[t]he Seventh Amendment to the U.S. Constitution [] guarantees Respondent a jury trial regarding an agency's allegations of violations and assessment of civil money penalties." Pl.'s Ex. C to the Compl., ECF No. 1-3 at 2 (citing *SEC v. Jarkesy*, 144 S. Ct. 2117). In its demand for a jury trial, Plaintiff noted that the Department of Labor's regulations do not provide an opportunity for a jury

trial. *Id.* On August 14, 2024, Plaintiff filed a motion to dismiss the administrative proceedings, raising statutory and regulatory arguments not relevant here. Pl.'s Ex. D to the Compl., ECF No. 1-4.

On August 16, 2024, the ALJ issued an order to show cause, directing both parties to further address Plaintiff's demand for a jury trial. Pl.'s Ex. E to the Compl., ECF No. 1-5. That same day, Plaintiff filed with the ALJ a motion for protective order and stay of discovery, seeking to halt all administrative proceedings until its demand for a jury trial and motion to dismiss were ruled on. *See* Pl.'s Ex. F, ECF No. 1-6. On August 28, 2024, the ALJ denied the motion for a stay of proceedings and set a hearing date for March 31, 2025. Pl.'s Ex. G to the Compl., ECF No. 1-7. On September 16, 2024, Plaintiff filed the Complaint in this case, challenging the administrative proceedings as a violation of the Seventh Amendment right to jury trial, a violation of due process under the Fifth and Fourteenth Amendments, and unlawful under the Administrative Procedure Act. ECF No. 1. On October 1, 2024, the ALJ denied Plaintiff's demand for a jury trial, concluding that the ALJ was "constrained to hear this case consistent with the applicable statute and regulations," which do not provide for a jury trial, and that there was no authority enabling the ALJ to grant a jury trial or to consider the constitutionality of the H-2A statute and regulations. Exhibit to Pl.'s Mem. in Supp. of Preliminary Injunction ("Pl.'s Mem."), ECF No. 13-4 at 3. The ALJ, aware of these concurrent proceedings in federal court, concluded that, "[u]ntil such time as the U.S. District Court for the Western District of Kentucky or other court of competent jurisdiction determines otherwise, the parties are to proceed for hearing in accordance with" the administrative procedures. *Id.* The following day, October 2, 2024, Plaintiff filed its Motion for a Preliminary Injunction in this matter. Pl.'s Mot. in Supp. of PI, ECF No. 12. Plaintiff served Defendants in this matter on November 12, 2024.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public

interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *Thompson v. DeWine*, 976 F.3d 610, 615 (6th Cir. 2020). The third and fourth factors, the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiff cannot establish any likelihood of success on the merits.

Plaintiff's claims fail as a matter of law and lack merit. Thus, Plaintiff cannot establish any likelihood of success on the merits and is not entitled to a preliminary injunction. The Supreme Court has long held and recently reiterated that Congress' "plenary power over immigration" concerns matters of public rights that can be constitutionally adjudicated within the Executive Branch. *Jarkesy*, 144 S. Ct. at 2132 (citing *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 331-34 (1909)). Thus, Congress acted well within its constitutional bounds by enacting the H-2A visa program to regulate the entry of foreign nationals into the United States for limited purposes, for limited times, under certain conditions, and ensuring compliance through administrative adjudication. Plaintiff voluntarily availed itself of the benefits of this scheme by importing and hiring foreign laborers to work on its behalf. And when Plaintiff violated the requirements that it had agreed to adhere to under the H-2A program, the Department of Labor carried out its enforcement role, as directed by Congress, using a process by which an ALJ, not a jury, adjudicates violations and imposes penalties. The administrative proceedings do not offend either the Seventh Amendment or the Due Process clause and are entirely consistent with the Administrative Procedure Act.

### A.    Congress constitutionally regulated agricultural work by foreign nationals and authorized the Secretary of Labor to adjudicate violations.

The importation of foreign labor is subject to a reticulated statutory and regulatory scheme, consistent with Congress' plenary authority to regulate immigration and to oversee work performed by foreign nationals that operates in conjunction with the domestic labor force. And the Department of Labor, following an investigation, charged Plaintiff with violations of the statutory and regulatory requirements for the H-2A visa program. Those violations are lawfully subject to the administrative

adjudication process. Nonetheless, Plaintiff mistakenly asserts that its conduct involves private rights that can only be adjudicated by a jury. Plaintiff fundamentally misunderstands the nature of Congress' "broad, undoubted power over the subject of immigration," arising both from the Constitution and Congress' "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). As the Sixth Circuit has recently reaffirmed, those are quintessential matters of public rights that have historically and constitutionally been determined by Congress and the Executive Branch in the first instance, with limited judicial review. *See Elgebaly v. Garland*, 109 F.4th 426, 437-38 (6th Cir. 2024).

The Constitution vests Article III courts with the judicial power of the United States, while simultaneously authorizing adjudications of non-Article III matters by the Executive Branch. Thus, the first Congresses tasked the Secretary of War with adjudicating whether veterans of the Revolutionary War were entitled to military pensions, see Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 CASE W. RESERVE L. REV. 1083, 1089-90 (2015), and directed federal collection officers to adjudicate and enforce payment of customs duties, Act of July 31, 1789, ch. 5, §§ 3-5, 1 Stat. 29, 36-37 (1789). "[S]ince the beginning of the Republic," executive officials have "conduct[ed] adjudications," which may take "'judicial' forms" but are ultimately "exercises of . . . the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. art. II, § 1. cl. 1).

In delineating which matters may be determined by the Executive, the Supreme Court has distinguished between "public rights" and "private rights." *Oil States Energy Services, LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018). Private rights, "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," are generally reserved to Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (citation omitted). But for public rights, "the mode of determining matters . . . is completely within congressional control," and Congress may decide the matter itself, "delegate that power to executive officers, or may commit it to the judicial tribunals." *Crowell v. Benson*, 285 U.S. 22, 50 (1932) (citation omitted).

The Supreme Court has not "definitively explained" the difference between public and private rights, but its "precedents have recognized that the [public-rights] doctrine covers matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Oil States*, 584 U.S. at 334 (first quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 (1982); then quoting *Crowell*, 285 U.S. at 50). That includes Congress' "plenary power over immigration," which squarely falls within the public rights doctrine. *Jarkesy*, 144 S. Ct. at 2132. Decisions concerning the admittance and removal of noncitizens, and the regulation of noncitizens' work within the United States may be carried out by "the executive or legislative departments" without "judicial determination." *Crowell*, 285 U.S. at 50-51 (identifying immigration decisions as a "[f]amiliar illustration" of public rights). So long as "Congress properly assigns a matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Oil States*, 584 U.S. at 345 (internal quotation marks omitted).

**B. Receiving federal permission to hire and import foreign nationals to work within the United States is a matter of public rights.**

The United States "has broad, undoubted power over the subject of immigration and the status of aliens" derived from both the Constitution and "its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 394-95. Immigration policy affects "trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id.* at 395. And "mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.* Since *Jarkesy* was decided, the Sixth Circuit has considered the implications of *Jarkesy* in immigration-related matters and held that "*Jarkesy* clearly does not implicate immigration adjudication," because the Court "explicitly referenced immigration as . . . an example of a matter concerning public rights." *Elgebaly*, 109 F.4th at 437-38. The Sixth Circuit's interpretation of *Jarkesy* is not only controlling in this district, but is also correct.

The Supreme Court has long recognized that the Executive Branch may administer immigration laws like the H-2A program and may—within the statutory bounds authorized by Congress—impose money fines for violations of those laws. In *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. at 330, the Supreme Court considered an Act that prohibited immigration of people with "a dangerous contagious disease," or who had previously agreed "to perform labor or service of any kind, skilled or unskilled." Pursuant to the Act's authority, the Secretary of Commerce and Labor assessed a money penalty against a steamship company that had brought infected immigrants into the country. *Id.* at 329. The company then sued to regain the money it had paid, arguing that the statute was unconstitutional because it allowed the Secretary to impose a money penalty without "resorting to the judicial power." *Id.* at 338.

The Supreme Court rejected that argument, explaining that Congress may "legislat[e] as to matters exclusively within its control," may "impose appropriate obligations," and "sanction their enforcement by reasonable money penalties," granting "executive officers the power to enforce such penalties without the necessity of invoking the judicial power." *Oceanic Steam Navigation*, 214 U.S. at 339. Because Congress' authority over immigration "embraces every conceivable aspect of that subject" then Congress may constitutionally "impose particular restrictions" and authorize "penalties enforceable by administrative authority." *Id.* at 340. In light of that "plenary power" to control "the admission of aliens," there was "no room for doubt as to [Congress'] authority to impose the penalty." *Id.* at 343.[1]

The Supreme Court reiterated that conclusion recently in *Jarkesy*, 144 S. Ct. 2117. There, the Court held that the Securities and Exchange Commission could not administratively impose money penalties for certain securities fraud violations because the relevant statutes "replicate common law fraud," and those essentially "common law claims must be heard by a jury." *Id.* at 2127. Further, the Court found that the securities laws claims did "not fall within any of the distinctive areas involving

---

[1] As explained above, the Secretary's imposition of penalties is still, of course, subject to judicial review to determine whether it is authorized by statute, supported by substantial evidence, and consistent with due process. *Lloyd Sabaudo Societa Anonima Per Azioni*, 287 U.S. at 335.

governmental prerogatives" that allow for administratively imposed money penalties. *Id.* As part of that analysis, the Court explicitly distinguished the securities laws from "Congress's power over foreign commerce" that it considered in *Oceanic Steam Navigation*, which "was so total that no party had a vested right to import anything into the country." *Jarkesy*, 144 S. Ct. at 2132 (quoting *Oceanic Steam Navigation*, 214 U.S. at 335). And under that reasoning, "Congress could also prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury." *Id.* at 2132-33.

While the outer bounds of the public rights doctrine are still not sharply delineated, *Jarkesy*, 144 S. Ct. at 2133, "'[r]epeated decisions of [the] court have determined that Congress has the power to exclude aliens from the United States; to prescribe the terms and conditions on which they may come in … and to commit the enforcement of such conditions and regulations to executive officers … and that the provisions of the Constitution securing the right of trial by jury have no application.'" *Oceanic Steam Navigation*, 214 U.S. at 334-35, 339 (quoting *United States ex rel. Turner v. Williams*, 194 U.S. 279, 289-90 (1904)); *accord Jarkesy*, 144 S. Ct. at 2132-33; *Atlas Roofing Co. v. Occupational Safety and Health Rev. Comm'n*, 430 U.S. 442, 456 (1977) (explaining that adjudications involving immigration are "public rights [that] may be assigned to administrative agencies").

That is true even when Executive adjudication might seem to touch upon common law issues, such as whether a noncitizen "did not enter her marriage in good faith," *Elgebaly*, 109 F.4th at 434— such issues still concern adjudications of "public rights" that can "be conducted by the executive branch." *Id.* at 437. *Cf. Trump v. United States*, 603 U.S. 593, 607 (2024) (describing "matters related to . . . immigration" as among the President's "important foreign relations responsibilities").

The H-2A visa program is an undisputed exercise of Congress' constitutional authority to regulate the entry of foreign nationals into the United States and to control the method by which those noncitizens perform work within the Nation's borders. Congress codified the program as part of the Immigration and Nationality Act of 1952, and further refined the program when enacting the Immigration Reform and Control Act of 1986. *See La. Forestry Ass'n*, 745 F.3d at 659. The purpose of the 1986 Act was to "close the back door on illegal immigration so that the front door on legal

immigration may remain open." *Noriega-Perez v. United States*, 179 F.3d 1166, 1170 (9th Cir. 1999) (quoting H.R. Rep. No. 99-682, at 46 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5649-50). Because Congress "believed that '[e]mployment is the magnet that attracts aliens here illegally,'" it prohibited employers from knowingly hiring "an unauthorized alien to work in the United States," *id.* (alteration in original) (first quoting H.R. Rep. No. 99-682(I) at 46, then citing 8 U.S.C. § 1324a), while simultaneously re-codifying and refining the H-2A visa program to ensure lawful avenues for foreign nationals to work in U.S. agriculture subject to certain conditions.

The H-2A program thus "provide[s] agricultural employers with an orderly and timely flow of legal workers," which "decreas[es] their reliance on unauthorized workers." *Changes to Requirements Affecting H-2A Nonimmigrants,* 73 Fed. Reg. 76,891, 76,891 (Dec. 18, 2008). In administering the program, Congress entrusted the Executive Branch to "maintain the careful balance between preserving jobs for U.S. workers" while appropriately "invit[ing] foreign workers to the United States" to perform much-needed work. *Id.* at 76,895. Consistent with those goals for the H-2A program, Congress required the Department of Labor to certify that there are not sufficient workers to perform the work specified in the employer's petition to hire foreign workers, and that the pay and work conditions offered to foreign workers would not "adversely affect" workers in the U.S. 8 U.S.C. § 1188(a)(1). This requires, in turn, that employers who elect to participate in the H-2A program must provide assurances that they will "furnish housing in accordance with regulations," *id.* § 1188(c)(4), hire qualified U.S. workers for the first half of the work contract, *id.* § 1188(c)(3)(B)(i); 20 C.F.R. § 655.135(d), "offer to provide benefits, wages and working conditions" as established by regulation, 8 U.S.C. § 1188(c)(3)(B)(i), and comply with "the criteria for certification," including the Secretary's regulations, *id.* § 1188(c)(3)(A)(i), which include minimum standards for pay, housing, transportation, and meals, 20 C.F.R. § 655.122.

These requirements are designed to "play[] a crucial role in the reservation of these jobs for U.S. workers," and to ensure that "employers . . . make serious attempts to recruit U.S. workers as a condition of H-2A certification." *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6,884, 6,921 (Feb. 12, 2010). The scheme reflects Congress' deliberate effort "to balance

the competing goals of the statute" by "protecting the jobs of domestic workers" on one hand while also increasing the supply of "documented foreign workers" on the other. *AFL-CIO v. Dole*, 923 F.2d 182, 186-87 (D.C. Cir. 1991).

Other aspects of the H-2A program ensure that foreign nationals remain in the United States only for their approved period of agricultural work. Employers must notify workers of their duty to leave the United States after completing the contract, 20 C.F.R. § 655.135(i), must provide or pay for workers' outbound transportation, *id.* § 655.122(h)(2), and they must notify the United States if a foreign worker fails to report to work, absconds from the worksite, is fired, or if the work is completed substantially earlier than anticipated, *id.* § 655.122(n); 8 C.F.R. § 214.2(h)(5)(vi)(B). These requirements "ensure that the workers timely depart the U.S. without risking negative immigration consequences for overstays of their" visas, while simultaneously ensuring that "employers are aware that they may not offer employment to foreign workers which exceeds the period certified" under the H-2A work period. *Temporary Agricultural Employment of H-2A Aliens in the United States*, 74 Fed. Reg. 45,906, 45,918 (Sept. 4, 2009).

Moreover, the United States has long used the H-2A program as one way to conduct international relations with other sovereigns, authorizing participation by countries when it "may serve the U.S. interest" and admitting nationals from non-eligible countries when "it is in the U.S. interest for that alien to be a beneficiary of" the program. 8 C.F.R. § 214.2(h)(5)(i)(F)(1)(i)-(ii). Thus, the government considers a variety of foreign policy concerns in excluding other nations from participation in the H-2A program—for example, countries have been excluded because they failed to adequately prevent human trafficking, they abused the H-2A program, or they insufficiently cooperated "in accepting back their nationals that have been ordered removed from the United States." *Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 83 Fed. Reg. 2,646, 2,647 (Jan. 18, 2018); *see also Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 86 Fed. Reg. 2,689, 2,690-91 (Jan. 13, 2021) (similar); *Identification of Foreign Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 86 Fed. Reg. 62,559,

62,561 (Nov. 10, 2021) (similar). And the U.S. has authorized participation in the H-2A program by countries that were previously excluded when doing so advances U.S. foreign policy interests. For example, Haiti was reauthorized to participate in the program, in part, because Haitians would "not only contribute to the U.S. economy, but [would] also apply their earnings and technical experience to advance Haiti's reconstruction and stabilization," which "is vital to the interests of the United States as a close partner and neighbor." 86 Fed. Reg. at 62,562.

In all these ways, the function and purpose of the H-2A visa program concerns the United States' sovereign interests in regulating employer-sponsored immigration, overseeing domestic work performed by foreign nationals, and managing diplomatic relations with foreign sovereigns. For that reason, all the opinions (including concurring and dissenting opinions) in *Jarkesy* separately reaffirmed that Congress exercises complete control over immigration, and within that area "administrative officers should have the authority to enforce designated penalties without resort to the courts." *Jarkesy*, 144 S. Ct. at 2133 n.1 (quoting *Oceanic Steam Navigation*, 214 U.S. at 339); *id.* ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over that with which the act we are now considering deals."). Given "Congress's long-recognized and extensive authority over the field of immigration," regulation of immigration has thus been "traditionally included" within the core of public rights, *id.* at 2146, 2151 (Gorsuch, J., concurring), and a "civil-penalty statutory scheme" for immigration violations is "beyond all question constitutional," *id.* at 2160 (Sotomayor, J., dissenting) (quoting *Oceanic Steam Navigation*, 214 U.S. at 342). Accordingly, Plaintiff's attempts to "press this constitutional challenge after the release of the Court's decision in *Jarkesy*, [must be] unsuccessful because," as the Sixth Circuit has already held, "*Jarkesy* clearly does not implicate immigration adjudication." *Elgebaly*, 109 F.4th at 437-38 (recognizing that the Court "explicitly referenced immigration as . . . an example of a matter concerning public rights").

Plaintiff's contrary arguments rest on mistaken premises. Plaintiff erroneously asserts that the Court can rule in its favor on the Seventh Amendment and Due Process claims because the "wage-related violations" that it is accused of "are legal in nature" and "analogous to a common law breach of contract action," or other unpaid wages claim, "such that a jury trial right attaches." Pl.'s Mem. at

6-7, ECF No. 13.[2] But Plaintiff cannot establish a jury trial right simply by attempting to analogize its violations to a breach of contract and other "private rights." Pl.'s Mem. 6, 8-9. The mere fact that a violation of immigration laws might be compared to a common-law claim does not place it outside of Congress' authority to regulate immigration and require Article III jurisdiction in the first instance. Forgery may be likened to common-law claims—but forging documents to demonstrate that a foreign national may legally work within the United States concerns "the public right to regulate immigration." *Noriega-Perez*, 179 F.3d at 1177 (upholding civil penalties under 8 U.S.C. § 1324c). Regulating the "unlawful employment of" noncitizens is "an important aspect of U.S. immigration law," and the courts have "long recognized that the power to exclude alien laborers is a 'matter of public rights.'" *Id.*

Plaintiff next argues that because the remedies sought here include both civil penalties–which Plaintiff argues are "money damages" that "are legal in nature"–as well as unpaid wages, these are "quintessential legal remed[ies]" that are "all but dispositive" in favor of its Seventh Amendment and Due Process claims. Pl.'s Mem. 7-8 (quoting *Jarkesy*, 144 S. Ct. at 2120). But that misreads *Jarkesy*, which explained that the presence of punitive civil penalties was "all but dispositive" of whether a matter concerns legal claims that implicate the Seventh Amendment. 144 S. Ct. at 2129. That inquiry, however, is distinct from the question of whether a case involves public rights, including the quintessential public right to regulate immigration and to impose civil penalties for violations of the

---

[2] Although Plaintiff asserts that the lack of jury trial violates both the Seventh Amendment and Due Process, Plaintiff's memorandum of law includes no separate analysis on the Due Process issue, and Plaintiff appears to treat both claims as identical. In any event, the proceedings before the ALJ provide numerous procedural protections to litigants, including motions to dismiss, 29 C.F.R. § 18.70(c), the ability to take discovery, *id.* § 18.50-65, and the equivalent to motions for summary judgment, *id.* § 18.72(a). There may also be the equivalent of a bench trial where the parties present evidence and testimony to the ALJ, after which the ALJ "must issue a written decision and order." *Id.* §§ 18.92; 18.81-.82; 501.41. The Federal Rules of Civil Procedure also apply to proceedings before an ALJ in any situation not provided for or controlled by the governing statute or applicable regulations. *Id.* § 18.10(a). Thus, the proceedings provide more than adequate notice and opportunity to be heard to comport with Due Process. *See Mathews v. Eldridge*, 424 U.S. 319 (1976); *Crowell*, 285 U.S. 22 at 45-48.

immigration laws. *Id.* at 2132-33. The mere existence of civil monetary penalties does not transform a matter of public rights into a matter of private rights.

Plaintiff likewise misreads *Jarkesy* to conclude that the public rights exception does not apply here. Pl.'s Mem. 8-9. Plaintiff is simply incorrect in its attempts to characterize the administrative proceeding as a dispute "between private parties, namely O'Bryan and 117 workers." *Id.* at 8. Plaintiff challenges an administrative proceeding that is adjudicating violations of immigration laws, and the only parties to the proceeding are Plaintiff and the Department of Labor. Enforcement actions for immigration violations are not "claims that are commonly litigated by private parties." Pl.'s Mem. at 8. The fact that the violations of immigration laws harmed third parties does not transform a quintessential public rights case into a private rights one. *See, e.g., Atlas Roofing*, 430 U.S. at 447 (petitioners faced enforcement proceedings because employee deaths resulted from unsafe workplace conditions); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 22 (1937)(respondents faced enforcement proceedings based on discriminating against, coercing, and intimidating employees).

But more fundamentally, Plaintiff has no private right to bring foreign nationals into the United States for any reason. This is not "the stuff of the traditional actions at common law tried by the court at Westminster in 1789." *Jarkesy*, 144 S. Ct. at 2132 (citation omitted). Plaintiff is allowed to import and hire foreign laborers solely because Congress has enacted a statutory scheme to permit such activity under strictly controlled circumstances (consistent with Congress' plenary authority to control immigration). Within that administration of public rights, Congress has directed the Executive to "administer[] a complex regulatory scheme to allocate costs and benefits among voluntary participants in the program without providing an Article III adjudication." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985).

In the H-2A visa program, Congress chose to admit certain foreign nationals, on certain terms, to engage in certain work, for a limited time, subject to specified requirements for wages, benefits, and work conditions to preserve the domestic labor force and to further U.S. foreign policy interests. Plaintiff chose to avail itself of that program and to access foreign workers it could not hire otherwise, and the workers themselves could not otherwise enter the U.S. absent an independent basis for

admission. When Plaintiff violated the terms of that scheme, it undermined the choices—made by the politically accountable branches—about how foreign laborers may be permitted to work within the United States.

The H-2A program is fundamentally an exercise of "the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1823 (2024). That is why President Reagan—in signing the 1986 amendments that codified the current H-2A visa program—explained that the Act "preserves and enhances the Nation's heritage of legal immigration" while simultaneously taking "a major step toward meeting th[e] challenge" of unlawful immigration that affects "our sovereignty." Statement On Signing the Immigration Reform and Control Act of 1986, 2 Pub. Papers 1522, 1522 (Nov. 6, 1986). Plaintiff does not seriously dispute that the United States may impose civil penalties on noncitizens already within the country for immigration violations. *See, e.g., Velasquez-Tabir v. INS*, 127 F.3d 456, 457-58 (5th Cir. 1997) (upholding civil penalty against foreign national who presented his employer with a falsified green card); *Remileh v. INS*, 101 F.3d 66, 67 (8th Cir. 1996) (similar). And the immigration laws apply equally to those who employ foreign nationals within the Nation's borders. *Villegas-Valenzuela v. INS*, 103 F.3d 805, 808 (9th Cir. 1996).

Consistent with that understanding, Congress has enacted many statutes that enforce compliance of the immigration laws (based on activities occurring within the Nation's borders) through Executive adjudication and, where necessary, civil penalties. Those include:

- An employer may not make willful misrepresentation or substantially fail to comply with the terms of a petition to import foreign nationals under the H-2B visa program. 8 U.S.C. § 1184(c)(14)(A)(i).

- Employers petitioning the government to allow foreign nationals to work under an H-1B visa may not substantially fail to meet the required conditions, and penalties will be increased for willful misrepresentations. 8 U.S.C. § 1182(n)(2)(C).

- Employers may not knowingly hire or continue to employ a noncitizen who is not authorized to work in the United States. 8 U.S.C. § 1324a(a)(1)-(2), (e)(4).

•   Sponsors who support the admittance of foreign nationals under a "suitable and proper bond" must inform the Attorney General if they change address. 8 U.S.C. §§ 1183, 1183a(d).

*See also* 8 U.S.C. § 1288(c)(4)(E) (civil penalties for failure to meet or misrepresent requirements for noncitizens to perform longshore work at U.S. ports); 8 U.S.C. § 1375a(d)(1), (5) (civil penalties for international marriage brokers who market to children). These enforcement measures are all exercises of the United States' sovereign authority to regulate lawful admission into the country and lawful work by noncitizens. They are public rights that Congress can constitutionally assign to adjudication in administrative tribunals without a jury. *Crowell*, 285 U.S. at 50.

### C.  Plaintiff's APA claim is duplicative of its Seventh Amendment and Due Process claims, and Plaintiff likewise lacks any likelihood of success on the merits on that claim.

Plaintiff's APA claim is premised on the assertion that, in failing to provide a jury trial, the ALJ acted "contrary to constitutional right, power, privilege, or immunity." Pl.'s Mem. 9 (quoting 5 U.S.C. § 706(2)(B)). But because Plaintiff is incorrect that *Jarkesy* and the Seventh Amendment require a jury trial in the administrative proceedings, Plaintiff is likewise incorrect that failing to provide a jury trial violates the APA. In codifying the H-2A visa program, Congress provided that the Secretary of Labor "is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section." 8 U.S.C. § 1188(g)(2). The statute, on its face, authorizes the Secretary to impose civil penalties and take other necessary actions, and Congress instructed the government to promulgate implementing regulations within seven months. IRCA, § 301, 100 Stat. at 3416. Accordingly, the Secretary proposed and issued regulations to provide for a hearing and secretarial review of actions to "assess civil money penalties" and "recover unpaid wages." *Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of the Immigration and Nationality Act*, 52 Fed. Reg. 16,795, 16,796-97 (May 5, 1987); 52 Fed. Reg. at 20,526-27. The substance of those regulations have remained in place since their promulgation. 29 C.F.R. §§ 501.15-501.47. For the reasons discussed above, Congress acted within its plenary authority to regulate immigration in enacting the H-2A program and tasking the

Secretary of Labor with ensuring program compliance, including through penalties and other necessary actions. As such, a jury trial is not required in this matter of public rights. Thus, Plaintiff's APA claim lacks any likelihood of success on the merits.

## II.    Plaintiff cannot establish irreparable harm.

Plaintiff's sole assertion of irreparable harm is that it is being subjected to "unconstitutional agency authority" in the form of "an illegitimate proceeding." Pl.'s Mem. 10 (citing *Axon Enter. Inc. v. F.T.C.*, 598 U.S. 175, 191-92 (2023)). Plaintiff relies exclusively on *Axon* in support of its argument that it has established irreparable harm if illegitimate administrative proceedings are not enjoined. Pl.'s Mem. 10. But Plaintiff misreads *Axon*, which held simply that Congress had not impliedly precluded district court review of Article II challenges to the structure of a federal agency. 598 U.S. at 180. The narrow jurisdictional question at issue in *Axon* has no bearing on whether Plaintiff has established irreparable harm, and the Supreme Court has never held that an *Axon* injury merits emergency relief. *See Meta Platforms, Inc. v. FTC*, No. CV 23-3562 (RDM), 2024 WL 1121424, *9-10 (D.D.C. Mar. 15, 2024) ("A 'here-and-now injury' [under *Axon*] is not, as [plaintiff] suggests, synonymous with an irreparable injury"), *appeal docketed*, 24-5054 (D.C. Cir. Mar. 15, 2024), *den. inj. pending appeal*, No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024). The Supreme Court did not in *Axon* establish a broad entitlement on the merits to a preliminary injunction in every case where constitutional challenges are raised. *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 759 (10th Cir. 2024) (citing *Collins v. Yellen*, 594 U.S. 220 (2021)), *petition for cert. filed*, No. 24-156 (U.S. Aug. 13, 2024). And courts interpreting *Axon* and *Collins* have been deliberate not to misunderstand the Supreme Court's pronouncements about jurisdiction in *Axon* as a holding that a party is automatically entitled to relief based on constitutional challenges to agency adjudications *Id.; see also YAPP USA Auto. Sys., Inc. v. NLRB*, No. 24-12173, 2024 WL 4119058, at *14 (E.D. Mich. Sept. 9, 2024), *appeal docketed*, No. 24-1754 (6th Cir. Sept. 9, 2024), *den. stay pending appeal*, No 24-1754, 2024 WL 4489598 (6th Cir. Oct. 13, 2024), *den. appl.*, No. 24A348, 2024 WL 4508993 (U.S. Oct. 15, 2024). Plaintiff's irreparable harm arguments fail under this framework.

In fact, when faced with these arguments, courts in the Sixth Circuit have concluded that merely being subject to a proceeding before an ALJ does not constitute irreparable harm sufficient to warrant preliminary relief. *YAPP USA*, 2024 WL 4119058, at *14; *see also YAPP USA*, 2024 WL 4489598, at *2-3 (6th Cir. Oct. 13, 2024) (noting that *Axon* "only upheld district court jurisdiction to consider collateral constitutional challenges to administrative proceedings," and concluding that it is not "a broad ruling that creates an entitlement on the merits to a preliminary injunction in every case where such constitutional challenges are raised") (quoting *Leachco*, 103 F.4th at 759) As explained above, supra at 5, any decision by the ALJ is appealable to Administrative Review Board. 29 C.F.R. § 501.42; *see also Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 491 (5th Cir. 2005). The Secretary of Labor may also personally review the Board's decision, and any penalties imposed may also be subject to judicial review. 85 Fed. Reg. at 13,188; 29 C.F.R. §§ 501.42(a), 501.33(a) (both referencing "judicial review"); *Lloyd Sabaudo Societa Anonima Per Azioni*, 287 U.S. at 335 (identifying areas of judicial review while upholding the constitutionality of administrative penalties for immigration violations). Plaintiff has not demonstrated that a final agency order or, following judicial review, court decision, in its favor would fail to remedy any alleged harm incurred during the administrative proceeding. *Cf. Sampson v. Murray*, 415 U.S. 61, 91 (1974) (concluding that reputational damage from an agency's alleged failure to follow necessary procedures "would be fully corrected by an administrative determination requiring the agency to conform to the applicable regulations"). And the Supreme Court has rejected the argument "that the expense and disruption of defending [oneself] in protracted adjudicatory proceedings constitutes irreparable harm," even if the expense is "substantial" and "unrecoupable." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980); *see also Borden, Inc. v. FTC* 495 F.2d 785, 789 (7th Cir. 1974); *Martin Marietta Energy Sys., Inc. v. Martin*, 909 F. Supp. 528, 533 (E.D. Tenn. 1993).

Plaintiff's lengthy delay in seeking injunctive relief also weighs against a finding of irreparable harm. *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019) (holding that a six-month delay was not unreasonable). Plaintiff received the Department of Labor's notice of assessing civil penalties in October of 2022, and requested a hearing before an ALJ in November of 2022, but did not assert its Seventh Amendment rights until July of 2024—nearly twenty months later. *See*

*Sarnova HC, LLC v. Reetz*, No. 2:21-CV-0601, 2021 WL 1257081, at *4 (S.D. Ohio Apr. 5, 2021) (holding that ten-month delay in filing suit undermined need for injunctive relief).

Finally, where a plaintiff cannot establish a likelihood of success on the merits, it has also failed to establish any irreparable injury or entitlement to a preliminary injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 825 (6th Cir. 2001). Such is the case here: because Plaintiff's claims of a deprivation of constitutional rights fail on the merits, it has failed to establish any entitlement to a preliminary injunction. *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

### III.    The balance of the equities do not favor entering an injunction here.

The third and fourth injunctive factors, the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These combined factors weigh against relief here because the public has a strong interest in enforcement of the Immigration and Nationality Act, including enforcement of the H-2A visa program. Enjoining the administrative proceeding at issue would frustrate those Congressional objectives, preventing the Secretary of Labor from  ensuring that the employment of temporary foreign agricultural workers does not "adversely affect the wages and working conditions of" similarly employed workers in the U.S. and enforcing employer compliance with terms and conditions of the H-2A program, 8 U.S.C. § 1188(a)(1), and causing the United States to "suffer[] a form of irreparable injury" as a result. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *cf. Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021) ("[T]he public interest necessarily weighs against enjoining a duly enacted statute."). On the other hand, Plaintiff has not shown that it will suffer any harm from proceeding with the ongoing administrative proceedings before this Court has the opportunity to decide this case on the merits, because the hearing in question is not scheduled to occur until March 31, 2025.

### CONCLUSION

For these reasons, the court should deny Plaintiff's motion for a preliminary injunction.

Dated: November 21, 2024                    Respectfully Submitted,

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Branch Director

*/s/ Anna L. Deffebach*
Anna L. Deffebach (DC Bar # 241346)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8356
Facsimile:   (202) 616-8460
Email: anna.l.deffebach@usdoj.gov

*Counsel for Defendants*